JEROME MCKINNEY v. THE STATE.

No. 23172. Delivered December 5, 1945.
Rehearing Denied January 2, 1946.

The opinion states the case.

*O. B. Fisher*, of Paris, for appellant.

*Ernest S. Goens*, State's Attorney, of Austin, for the State.

DAVIDSON, Judge.

Connie Henry operated an electric repair shop in the City of Paris. Appellant was the local manager of the telephone company. On July 25, 1944, Henry made an application to the company for a telephone in his place of business.

Telephone installation was controlled by order promulgated by the War Production Board and service furnished in accordance with certain classifications. Henry's application was received and given a low classification. He insisted that he was entitled to have his application given a higher classification—one whereby he would receive service sooner than in the classification in which he had been placed. Henry made repeated trips to the office of the telephone company—some nine times, he said—trying to get his application re-classified. He said that on some of these occasions he endeavored to contact the local manager relative thereto, but to no avail.

On August 24, 1944, Henry addressed a letter to Mr. Ralph Innis, in care of the telephone company at Dallas. Innis was the head of the "Commercial Department" of the telephone company and also head of the "Telephone Employee's Union." The contents of the letter are as follows:

"On Tuesday, July 22, 1944, we made application for a telephone. For one reason or another, and without discussion we were arbitarily placed in a schedule near the end of the line.

' "We are engaged in the maintenance and repair of equipment used in essential food storage and manufacture, as well as serving Camp Maxey. After discussion of our problem with our customers, they are of the ·opinion that our application should at least be in schedule A of your local files.

"We are not attempting to tell you how to operate your company or tell you that we must have a telephone at once, but we think that we are entitled to some consideration and that you are entitled to know that your Company is receiving undue criticism because of your local management by the people of Paris.

"We have made nine trips to your local office to contact the manager, to no avail. We timed those trips to coincide with the time suggested by the office employees. From what we learned by various means, he was either engaged in the cattle business, Chamber of Commerce duties or other personal affairs.

"It is our firm opinion that your local management is far from the usual high standards set by your Company.

"Will you please let me know by return mail what can be done about this matter. Thank you for your cooperation."

Such is the condition existing when, on the afternoon of August 31, 1944, appellant—accompanied by George McNeal, an employee of the telephone company—walked into Henry's place of business and introduced himself. He threw the above letter on the desk where Henry was seated and said, "Now, by God, you are going to eat that letter, every piece of it. God damn you, start chewing." Henry said that he asked appellant if there was any way out of it, to which appellant replied, "No, by God, you are going to eat it." Henry testified further:

"And about that time he started striking with his fists around my eyes. I staggered back and when I did I noticed this thermostat there on my desk and I picked it up and drew it back. When I drew it back, Mr. McKinney ran his hand in his right hand—in his right pocket, and said, 'If you hit me with that, I will cut your ·God damn throat.' And about that same instant, Mr. McKinney's companion and man that had come down with him, reached over and jerked this out of my hand.

"A man whom I cannot identify came into our place with McKinney. I didn't get a good look at him. He was rather large and rather tall, and other than that, I couldn't say. McKinney kept insisting that I eat that letter and I took out a bite of the letter and when I realized what I was doing, I spit the piece of

paper out that I had taken in my mouth and Mr. McKinney then,—that irritated him more, apparently from his expression—and I was on the other side of the little enclosure we call an office and Mr. McKinney came over there with both fists flying. They were striking me, and I couldn't get out of the way, my back was to the wall. I tried to push him back with my foot and he grabbed it and then he got ahold of me and he had his arms around me and he scratched my forehead with something. I don't know what it was. At the time I said to Mr. McKinney, 'If you will quit beating me, I will do whatever you want me to do.' He says, 'All right, now by God, you are going back up to my office with me and apologize to the girls.' I asked him if he would let me clean up and wash my face as it was bloody and he said, 'Yes, but don't try any funny stuff. I have got my eye on you.' I went in the wash room with Mr. McKinney behind. He, however, did not step in the wash room with me. I washed my face and locked the doors, got in the car and went up to the telephone office.

"The man I described was still with McKinney. McKinney drove the car. I walked into the office—Mr. McKinney slightly to my rear and this other fellow slightly to my rear and more or less on each side of me, and I walked up to Miss Eubank's desk and told her that if I had caused anybody any inconvenience, if I had hurt anybody's feelings, or caused any disruption in routine—I don't remember my exact words—that I was sorry, and turned around. Mr. McKinney says 'Let's go' and he drove me back to the shop and he let me out and I unlocked the doors and went on back to work.

"I stayed at the shop until between 7:30 and 8:00, then went home. This was on Thursday. I can point out the man who hit me on that occasion. It was McKinney. McKinney drove the car. I went to the telephone office on that occasion with McKinney because that was the condition under which he stopped beating on me."

The foregoing is a statement of the facts from the standpoint of the State, and upon which the jury convicted appellant of the offense of false imprisonment by assault and violence, and assessed his punishment at a fine of $500.00.

The defensive theory, as shown by his testimony and corroborated by other witnesses, was that Henry accompanied him to the telephone office freely and voluntarily and of his own accord. He denied any assault upon his part and asserted that

if there was any assault or act of violence on his part toward Henry, such was in his own necessary self-defense from the attack of Henry.

Appellant asserted that he went to Henry's place of business on the occasion mentioned to talk with Henry about his application.

The jury having rejected the defensive theories, no necessity exists to give a detailed statement of the facts relative thereto. The sufficiency of the evidence is to be tested from the State's testimony.

An essential of the offense of false imprisonment is that the detention must be against the consent of the person detained. Art. 1169, P. C.

The instant indictment, in order to comply with that provision of the statute, directly charged that the detention was against Henry's consent. The State was, therefore, under the burden of establishing this allegation, by proof, in order to sustain a conviction.

The appellant insists that the State has failed to meet that burden and, by reason thereof, the facts are insufficient to support the conviction.

Henry did not say in so many words that his detention was without his consent, but he did say: "I went to the telephone office on that occasion with McKinney because that was the condition under which he stopped beating on me."

The witness went with appellant consentingly, but such consent was obtained by force. The witness makes it plain that the violence offered him by appellant and the condition of his relief therefrom was equivalent to a direct statement that he would not have done so had it not been for the beating he received and the promise of a cessation thereof should he go to the telephone office and offer an apology.

It would be a peculiar doctrine to hold in the instance of one who is approached by a highwayman with the admonition of "your money or your life" and who willingly gives up his money to preserve his life, that such money was taken from him with his consent. This would seem to us to be contrary to reason—

the transaction itself disproving a willing consent to be thus deprived of one's property. We think that the evidence is sufficient to show proof of lack of consent upon the part of Henry and that the trip to the telephone office was made under duress of the beating he suffered.

Appellant contends that if the offense of false imprisonment was shown under the facts, such was not the result of an assault but of threats and, inasmuch as the case was submitted to the jury, alone, upon the theory of false imprisonment by an assault and violence, the jury's conclusion was not supported by the facts.

The holding that the facts are sufficient to show imprisonment by assault and violence also determines adversely the contention of appellant in the respect mentioned.

There was testimony to the effect that prior to the time appellant went to Henry's place of business, he made the statement that he was going down there to whip him and that after the difficulty and after Henry had made the apology to the young lady at the telephone office, he made the statement he "had made Connie Henry eat the letter."

This testimony was objected to as being immaterial and prejudicial. The testimony, being declarations of appellant against interest and tending to show his state of mind, was admissible upon the issue of wilfulness.

Exception was reserved to the receipt in evidence of the statement of Henry to the effect that the reason he went to the telephone office with appellant was "because that was the reason he stopped beating on" him, over appellant's objection that such was an opinion and conclusion of the witness.

The statement was a short-hand rendition of the facts and therefore not subject to the objection urged. Branch's P. C., sec. 132, p. 73.

By exception to the charge and by special requested charge, appellant sought to have the jury instructed to the effect that unless the injured party "desired to move from one place to another and was prevented and detained from so moving from one place to another as he saw proper," they should acquit. In other words, it is appellant's contention that the detention neces-

sary to constitute false imprisonment arises only when the injured party desires to move from one place to another and unless he so desires and was prevented therefrom there is no detention.

Such is not the law, for under the provisions of Art. 1171, P. C., the impediment necessary is required to be such "as in its nature calculated to detain," and therefore not dependent upon the violations of the injured party.

Other exceptions and objections appear to the charge. These have been examined and, in the light of the special requested charges which were given, are deemed without merit, and are overruled without discussion.

Under the facts presented, a charge on circumstantial evidence was not called for, and appellant's contrary contention is overruled.

The judgment is affirmed.

The foregoing opinion of the Commission of Appeals has been examined by the Judges of the Court of Criminal Appeals and approved by the Court.

### ON MOTION FOR REHEARING.

HAWKINS, Presiding Judge.

Appellant's motion for rehearing simply urges again that the evidence does not support the conviction. The contention is not thought to be meritorious.

We observe that the motion was not filed until December 21. The opinion of affirmance was handed down on December 5. The 15 days within which a motion for rehearing should be filed expired on December 20; hence, even if meritorious the motion came too late. See Fitts v. State, 98 Tex. Cr. R. 146, 264 S. W. 1006, and cases therein cited; also Smith v. State, 127 Tex. Cr. R. 273, 75 S. W. (2d) 449.